Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

[Additional counsel appearing on signature page]

*Attorneys for Plaintiffs and the Putative Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT JORDAN, SEAN HALBERT, DANA SKELTON, and VANESSA RUGGLES, individually and on behalf of all others similarly situated, | Case No. 3:14-cv-00787-WHO |
| *Plaintiffs*, | **CLASS ACTION** |
| *v.* | **PLAINTIFFS' OPPOSITION TO DEFENDANT NATIONSTAR MORTGAGE LLC'S MOTION FOR STAY PURSUANT TO THE PRIMARY JURISDICTION DOCTRINE (DKT. 33)** |
| NATIONSTAR MORTGAGE LLC, a Delaware limited liability company, | |
| *Defendant*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iv

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND FACTS ........................................................................................... 1

III.    ARGUMENT .............................................................................................................. 3

        A.      That Multiple Petitions are Pending Before the FCC Does Not Mean this
                Case Should be Stayed Pursuant to the Primary Jurisdiction Doctrine—
                Interpretation of the TCPA Terms at Issue Falls Well Within the
                Experience of Judges, the Issues Haven't Been Delegated to the FCC,
                and Any Risk of Inconsistent Rulings is Nominal ........................................... 5

                1.      The Capacity Issue does not satisfy any of the four factors that
                        courts consider when determining whether to stay a case under
                        the primary jurisdiction ....................................................................... 6

                        a.      First, both the Ninth Circuit and the FCC have already
                                addressed the definition of capacity in the context of
                                predictive dialers .................................................................... 6

                        b.      Second, while equipment considerations fall within the
                                FCC's field of expertise, the Commission has repeatedly
                                ruled that a predictive dialer constitutes an ATDS ................. 7

                        c.      Third, the Capacity Issue it is not a question "particularly
                                within the agency's discretion." .............................................. 8

                        d.      Fourth, the Capacity Issue does not present a risk of
                                inconsistent adjudications ....................................................... 9

                        e.      This Court should decline to follow those judges who have
                                stayed cases pending the FCC petitions at issue and who
                                continue to await various rulings ........................................... 10

                        f.      Nationstar fails to show that any ruling from the FCC, which
                                could take years to receive, is actually imminent ................. 12

                2.      Courts also have the conventional experience of interpreting the
                        meaning of the term "called party" and have consistently
                        interpreted it to mean the subscriber of the telephone service at
                        the time the call is placed ................................................................... 13

                3.      Lastly, courts are well equipped to determine whether the TCPA
                        extends to debt collection activities—and have done so consistently
                        following FCC guidance ...................................................................... 15

        B.      A Stay is Inappropriate in any Case Because any FCC Decision Wouldn't
                Be Applied Retroactively ............................................................................. 18

      **C.**     **Considerations Applicable to Stays More Generally Weigh Against Freezing the Litigation Here** ............................................................................. 18

**IV.**    **CONCLUSION** ................................................................................................. 19

# **TABLE OF AUTHORITIES**

**UNITED STATES SUPREME COURT**

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ....................................18

*Clinton v. Jones*, 520 U.S. 681 (1997)........................................................18

*Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012).........................................3

*Sibron v. New York*, 392 U.S. 40 (1968)........................................................19

**UNITED STATES CIRCUIT COURT OF APPEALS**

*Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934 (8th Cir. 2005) .............................4

*Brown v. MCI WorldCom Network Serv., Inc.*, 277 F.3d 1166 (9th Cir. 2002) ....................4

*Charvat v. EchoStar Satellite, LLC,* 630 F.3d 459 (6th Cir. 2010) ............................15

*Clark v. Time Warner Cable*, 523 F.3d 1110 (9th Cir. 2008)...............................4, 5 n.4

*CMAX Inc. v. Hall*, 300 F.2d 265 (9th Cir. 1962).............................................18

*Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir. 2005) ....................................18

*Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038 (9th Cir. 2011) ..............4-5

*Meyer v. Portfolio Recover Associates, LLC,* 707 F.3d 1036 (9th Cir. 2012),
     *cert. denied*, 133 S. Ct. 2361 (2013) .............................................6, 7, 8, 9, 11

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014)...........................13

*Pagtalunan v. Galaza*, 291 F.3d 639 (9th Cir. 2002) .........................................18

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ...................3, 6, 9, 11

*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775 (9th Cir. 2002)...........5, n.4

*U.S. v. General Dynamics Corp.*, 828 F.2d 1356 (9th Cir. 2002) ...............................4

**UNITED STATES DISTRICT COURT**

*Abramson v. Caribbean Cruise Line, Inc.*, No. 2:14-CV-00435, 2014 WL 2938626
     (W.D. Pa. June 30, 2014)............................................................3

*Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343-TEH, 2014 WL 1942829
     (N.D. Cal. May 12, 2014) ........................................................14, 15

*Blair v. CBE Group Inc.,* No. 13-cv-134-MMA(WVG), 2013 WL 2029155
     (S.D. Cal. May 13, 2013)..........................................................17

*Dominguez v. Yahoo! Inc.*, No. 13-cv-1887, 2014 WL 1096051

(E.D. Pa. March 20, 2014) .................................................................................... 9 n.7

*Frydman v. Portfolio Recovery Associates, LLC*, No. 11-cv-524, 2011 WL 2560221
    (N.D. Ill. June 28, 2011) ..................................................................................... 18

*Glauser v. Twilio, Inc.*, No. 11-cv-2584 PJH, 2012 WL 259426 (N.D. Cal. Jan. 27, 2012) ............ 12

*Gragg v. Orange Cab Co., Inc.,* No. 12–cv-0576RSL, 2014 WL 801305
    (W.D. Wash. Feb. 28, 2014) ............................................................................... 9 n.7

*Heinrichs v. Wells Fargo Bank, N.A.*, No. 13-cv-05434-WHA, 2014 WL 2142457
    (N.D. Cal. Apr. 15, 2014) ........................................................................... 14, 15 n.10

*Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125 (W.D. Wash. 2012) ................................................ 8

*Higgenbotham v. Diversified Consultants, Inc.*, No. 13-cv-2624-JTM, 2014 WL 1930885
    (D. Kan. May 14, 2014) .................................................................................. 16, 17

*Higgingbotham v. Hollins*, No. 14-cv-2087-JTM-TJJ, 2014 WL 2865730
    (D. Kan. June 24, 2014) .............................................................................. 14, 15, 16

*Hunt v. 21st Mortg. Corp.*, No. 2:12-cv-2697-WMA, 2013 WL 5230061
    (N.D. Ala. Sept. 17, 2013) ...................................................................................... 9

*Hurrle v. Real Time Resolutions, Inc.*, No. 13-cv-5765-BHS, 2014 WL 670639
    (W.D. Wash. Feb. 20, 2014) ......................................................................... 11, 16, 17

*Iniguez v. The CBE Grp.*, 969 F. Supp. 2d 1241 (E.D. Cal. 2013),
    *recons. denied* (Dec. 5, 2013) ............................................................................. 17

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ....................... 7

*Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716 (S.D. Tex. 2012) .................................................... 8

*Mendoza v. UnitedHealth Grp. Inc.*, No. 13-cv-1553-PJH, 2014 WL 722031
    (N.D. Cal. Jan. 6, 2014) ..................................................................................... 10

*New York State Thruway Auth. v. Level 3 Commc'ns, LLC*, 734 F. Supp. 2d 257
    (N.D.N.Y. 2010) ............................................................................................ 2 n.2

*Olney v. Progressive Cas. Ins. Co.*, No. 3:13-CV-2058-GPC-NLS, 2014 WL 294498
    (S.D. Cal. Jan. 24, 2014) .................................................................................... 17

*Passero v. Diversified Consultants, Inc.*, No. 13-CV-338C, 2014 WL 2257185
    (W.D.N.Y. May 28, 2014) ............................................................................... 11, 16

*Pimental v. Google, Inc.*, No. C-11-02585-YGR, 2012 WL 1458179
    (N.D. Cal. Apr. 26, 2012) ........................................................................... 5 n.4, 6, 8

*Robinson v. Midland Funding,* No. 10-cv-2261-MMA(AJB), 2011 WL 1434919
    (S.D. Cal. Apr. 13, 2011) .................................................................................... 17

*Sherman v. YahooA Inc.*, No. 13-CV-0041-GPC-WVG, 2014 WL 369384
    (S.D. Cal. Feb. 3, 2014) ..................................................................................... 6, 9

**FEDERAL COMMUNICATIONS COMMISSION**

*In re Commc'n Innovators' Pet. for Declaratory Ruling*, CG Dkt No. 02-278 (Jun. 7, 2012) ........... 3

*In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    18 FCC Rcd. 14014 (July 3, 2003) ............................................................................... 7

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    23 F.C.C. Rcd. 559 (2008) ...................................................................................... 17

*In re Prof'l Ass'n for Customer Engagement's Pet. for Expedited Declaratory Ruling*,
    CG Dkt No. 02-278 (Oct. 18, 2013) ......................................................................... 3

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    18 FCC Rcd. 14014 (2003) ..................................................................................... 7

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    19 FCC Rcd. 19215 (2004) ..................................................................................... 8

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    23 FCC Rcd. 559 (2008) ................................................................................ 7-8, 17

*In re United Healthcare Servs. Pet. for Declaratory Ruling Regarding Reassigned
    Wireless Tel. Nos.*, CG Dkt No. 02-278 (Jan. 16, 2014) ............................................... 3

*In re YouMail's Pet. for Expedited Declaratory Ruling and Clarifications*,
    CG Dkt No. 02-278 (Apr. 19, 2013) ......................................................................... 3

**STATUTES, RULES AND REGULATIONS**

Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ........................................... 1

**OTHER RESOURCES**

Hanah Cho, *Nationstar Mortgage Posts Lower 1O Profit and Acauires a Real
    Estate Services Company*, Dallas News (May 8. 2014. 9:09 AM)
    http://bizbeatblog.dallasnews.com/tag/nationstar-mortgage/ ................................... 2 n.1

Mobile Informational Call Act of 2011, H.R. 3035, 112th Cong. (2011) ........................... 7

National Association of Attorneys General, Letter to Members of Congress
    (Dec. 7, 2011), http://law.ga.gov/vgn/images/portal/cit_79369762/179228493Final%
    20HR3035%20Letter.pdf) .................................................................................. 7 n.6

U.S.D.J. Resp. to Mot. to Dismiss, No. 11-MD-2261-JM-JMA, Dkt. 46 ........................... 7

## I. INTRODUCTION

Servicing its mortgages as if the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") simply didn't exist, Defendant Nationstar Mortgage ("Nationstar") uses its auto-dialer equipment to make repeated, harassing calls to borrowers' and non-borrowers' cellular and landline telephones without their consent. Plaintiffs are four consumers out of thousands who've been subjected to these calls and have brought this case seeking statutory damages and related relief.

Yet rather than acknowledge its wrongdoing (let alone bring its practices into compliance with the TCPA), Nationstar presents what is increasingly becoming the defense tactic *de jour*: a request that the Court stay the case in light of a backlog of FCC petitions that raise a handful of already-settled issues (such as the definition of the terms "capacity" and "called party" and whether the TCPA applies to debt collectors). Nationstar claims that rulings on these matters are supposedly imminent and urges the Court to wait until the FCC has concluded its process.

Nationstar is incorrect and its Motion to Stay should be denied. As explained below, Nationstar and the petitions upon which it relies (one of which has been pending for over two years) seek to upend already settled law. Furthermore, Nationstar cannot satisfy any of the four factors that courts in the Ninth Circuit consider when deciding to stay cases pursuant to the primary jurisdiction doctrine, show that any ruling from the FCC is actually imminent, or show that any decision from the FCC would apply retroactively to absolve Nationstar of its statutory violations. Nationstar also ignores traditional considerations when evaluating stays—including the risk that witnesses' memories will fade over time and evidence will become stale or unavailable. As such, the Court should deny Nationstar's Motion for Stay and allow Plaintiffs to have their day in court.

## II. BACKGROUND FACTS

Nationstar is a mortgage loan servicer. That is, Nationstar sends out monthly mortgage statements, collects payments, pays the owners/investors of the notes or other appropriate parties, calculates borrower escrows, and performs other functions and duties attendant to the servicing

of its mortgage loan portfolio.[1]

In the course of its business, Nationstar makes thousands of telephone calls to consumers. (First Am. Compl. ("Compl."), Dkt. 31, ¶ 59.) These calls are harassing and are made without the called parties' consent. (*Id*. ¶ 4.) In many instances (like with Vanessa Ruffles and Robert Jordan) the consumers don't even have loans with Nationstar. (*Id*. ¶¶ 32, 52.) Worse yet, in the cases of Ms. Ruggles, Sean Halbert, and Dana Skelton, Nationstar has refused to honor their requests to stop calling them. (*Id*. ¶¶ 38, 50.) Nationstar placed its calls to cell phones (Ruggles, Halbert, and Skelton) and to landlines (Jordan). (*Id*. ¶¶ 27, 44, 53.)

In support of its Motion to Stay, Nationstar presents the untested[2] Declaration of Kent Lemon, a Nationstar Senior Vice President of Command Center Operations. Mr. Lemon states that Nationstar's dialing equipment "did not store or produce telephone numbers to be called using a random or sequential number generator" and "at the time the calls were placed, [the equipment] lacked the current capacity to store and produce telephone numbers to be called." (Decl. of Kent Lemon in Support of Mot. Stay ("Lemon Decl."), Dkt. 34, ¶¶ 2-3.) Plaintiffs allege however, based on having received abandoned calls from Nationstar and other indicators, that Nationstar used/uses auto-dialer equipment that functions in the same manner as a predictive dialer—which Nationstar hasn't disputed. (*See* Compl. ¶ 22.)

Rather than take measures to ensure that the called party has consented to receive its calls, honor consumer requests to not be called, or update its internal do-not-call list, Nationstar

---

[1] Nationstar's portfolio recently totaled $384 billion in unpaid principal balance. *See* Hanah Cho, *Nationstar Mortgage Posts Lower 1Q Profit and Acquires a Real Estate Services Company*, Dallas News (May 8, 2014, 9:09 AM) http://bizbeatblog.dallasnews.com/tag/nationstar-mortgage/.

[2] A stay shouldn't be granted on such a one-sided record, and to the extent any question exists in the Court's opinion as to whether a stay should be granted, Plaintiffs respectfully request leave to serve document requests related to Mr. Lemon's declaration (including the modifications that would be needed, if any, to provide Nationstar's equipment with the so-called current capacity to produce and store numbers using a random number generator and to dial them) and to take his deposition. *See, e.g., New York State Thruway Auth. v. Level 3 Commc'ns, LLC*, 734 F. Supp. 2d 257, 271 (N.D.N.Y. 2010) ("The Court ventures to state that discovery in this litigation may actually benefit any discussion before the FCC. As we noted before, if the factors indicate otherwise at some later point, the doctrine of primary jurisdiction can be raised again.").

asks that this Court to stay this case while the FCC considers the petitions filed in *In re Commc'n Innovators' Pet. for Declaratory Ruling*, CG Dkt No. 02-278 (Jun. 7, 2012) ("CI Petition"), *In re YouMail's Pet. for Expedited Declaratory Ruling and Clarifications*, CG Dkt No. 02-278 (Apr. 19, 2013) ("YouMail Petition"), *In re Prof'l Ass'n for Customer Engagement's Pet. for Expedited Declaratory Ruling*, CG Dkt No. 02-278 (Oct. 18, 2013) ("PACE Petition"), and *In re United Healthcare Servs. Pet. for Declaratory Ruling Regarding Reassigned Wireless Tel. Nos.*, CG Dkt No. 02-278 (Jan. 16, 2014) ("UHC Petition"). (Mot. Stay 6-8, 12.)

As explained below, this Court should deny Nationstar's Motion for Stay.

## III.   ARGUMENT

The TCPA was enacted to address the "intrusive invasion of privacy" that results from "[u]nrestricted telemarketing." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) (quoting congressional findings). To state a claim for cellphone calls, a plaintiff must allege that Defendants (1) made any call without the prior express consent of the called party, (2) using an automatic dialing system, (3) to any number assigned to a cellular telephone service. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009). For landline phones, plaintiffs must allege the defendant "(1) initiated the call to his residential landline, (2) with an artificial or prerecorded voice, (3) to deliver a message, (4) without his prior express consent, and (5) the call was not for one of the permissible purposes." *See Abramson v. Caribbean Cruise Line, Inc.*, No. 2:14-CV-00435, 2014 WL 2938626 (W.D. Pa. June 30, 2014).[3]

---

[3] The TCPA states, in relevant part, that it "shall be unlawful for any person within the United States, or any person outside of the United States if the recipient is within the United States[:]

> …to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice…to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call [(227(b)(1)(A)(iii)); or]

> …to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or

The primary jurisdiction doctrine (upon which Nationstar bases its Motion to Stay) "does not require that all claims within an agency's purview be decided by the agency." *Brown v. MCI WorldCom Network Serv., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). Nor is it intended "to secure expert advice for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Id.* (quoting *U.S. v. General Dynamics Corp.*, 828 F.2d 1356, 1365 (9th Cir. 2002)). Instead, primary jurisdiction is properly invoked as a basis for staying a case only when a case pending in federal court "requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Brown*, 277 F.3d at 1172; *see also General Dynamics*, 828 F.2d at 1362 ("The doctrine applies when protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.").

"Primary jurisdiction is not implicated simply because a case presents a question, over which the FCC could have jurisdiction . . . Rather, primary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Brown*, 277 F.3d at 1172. Ultimately, the doctrine "applies in a limited set of circumstances," *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008), and "is to be invoked sparingly, as it often results in added expense and delay." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005).

In the Ninth Circuit, courts asked to apply the doctrine consider whether: (i) the issue is within the "conventional experiences of judges," (ii) the issue "involves technical or policy considerations within the agency's particular field of expertise," (iii) the issue "is particularly within the agency's discretion," and (iv) "there exists a substantial danger of inconsistent rulings." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1048-49 (9th Cir.

is exempted by rule or order by the Commission under paragraph (2)(B) [(227(b)(1)(B)].

As explained above, *supra* Section II,, Nationstar's automated and prerecorded voice calls were placed to cellphones (Ruggles, Halbert, and Skelton) as well as to landlines (Jordan).

2011).[4]

Nationstar claims this case should be stayed because three issues are supposedly pending before the FCC: (1) the definition of "capacity" as used in the TCPA, specifically whether its dialing equipment must have the "current capacity" (as opposed to what Nationstar calls the "theoretical capacity") to store or produce telephone numbers to be dialed and to dial such numbers (hereinafter, the "Capacity Issue"), (2) whether a holder of a reassigned phone number is the "called party" (hereinafter, the "Reassigned Number Issue"), and (3) whether the TCPA applies to debt collectors (hereinafter, the "Debt Collector Issue"). Nationstar's request for a stay should be denied. As explained below, none of these issues satisfies the test for applying the primary jurisdiction doctrine, no ruling is imminent, it is doubtful that any FCC decision would apply retroactively, and traditional factors considered when evaluating requests for stays weigh against issuing one here.

A.    **That Multiple Petitions are Pending Before the FCC Does Not Mean this Case Should be Stayed Pursuant to the Primary Jurisdiction Doctrine— Interpretation of the TCPA Terms at Issue Falls Well Within the Experience of Judges, the Issues Haven't Been Delegated to the FCC, and Any Risk of Inconsistent Rulings is Nominal.**

Nationstar's assertions that its three Issues (Capacity, Reassigned Number, and Debt Collector) show the Ninth Circuit should stay this case pursuant to the primary jurisdiction doctrine fall apart. (*See* Mot. Stay 10-11, 15-16, 17-18.) As explained below, the Issues are well settled and do not require further clarification from the FCC. Nationstar cannot show that these issues were specifically delegated to the FCC. Courts are well suited to address the Issues—each one involves a question of statutory construction—and there is little risk, as evidenced by the decisions to date, of inconsistent adjudications. Accordingly, the primary jurisdiction doctrine

---

[4] The Ninth Circuit has also phrased the test as: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Pimental v. Google, Inc.*, No. C-11-02585-YGR, 2012 WL 1458179, at *4, n.2 (N.D. Cal. Apr. 26, 2012) (quoting *Clark*, 523 F.3d at 1115; *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 782 (9th Cir. 2002)).

does not apply.

**1.    The Capacity Issue does not satisfy any of the four factors that courts consider when determining whether to stay a case under the primary jurisdiction.**

As explained below, notwithstanding the decisions of other Courts to stay the litigation before them and wait (potentially years) for the FCC to rule upon the CI Petition, the YouMail Petition, and the PACE Petition, the capacity question does not satisfy the considerations typically weighed when deciding whether to apply the primary jurisdiction doctrine.

*a.    First, both the Ninth Circuit and the FCC have already addressed the definition of capacity in the context of predictive dialers.*

Although Nationstar largely ignores this fact, the simple truth is that this Court can readily decide whether the definition of the term "capacity" means the "current capacity" or "theoretical capacity," largely because this question has already been addressed by the Ninth Circuit and the FCC.[5] As the court in *Pimental* explained when denying a similar request for a stay based upon these same pending petitions:

> A district court is suited to resolve issues of statutory interpretation of . . . the term 'capacity' . . . Interpretation of these statutory terms do not require the FCC's policy expertise or specialized knowledge and are matters safely within the conventional experience of judges. Indeed, courts in the Ninth Circuit and the FCC have interpreted these statutory terms in the past.

2012 WL 1458179, at *3 (citing *Satterfield*, 569 F.3d at 951) ("a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it")); *see, e.g., Sherman v. YahooA Inc.*, No. 13-CV-0041-GPC-WVG, 2014 WL 369384 (S.D. Cal. Feb. 3, 2014) ("[I]n *Meyer v. Portfolio Recover Associates, LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012), the Ninth Circuit specifically considered and rejected a defendant's argument that its dialers did not fall within the statutory definition of ATDS because its dialers did not 'have the present capacity to store or produce numbers using a random or sequential

---

[5] By arguing that its equipment lacked the "current capacity" to perform specific functions, Nationstar is really advancing a defense that its predictive dialer doesn't meet the definition of an automatic telephone dialing system under the statute, *see* 47 U.S.C. § 227(a)(1), because it doesn't actually store, produce, or call random numbers at the time calls are made.

number generator.'"'"); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1261

(S.D. Cal. 2012) (citing U.S.D.J. Resp. to Mot. to Dismiss, No. 11-MD-2261-JM-JMA, Dkt. 46)

("As the government argues, 'Congress anticipated that advancements in technology would

allow telemarketers to employ new and more sophisticated ways of auto-dialing large lists of

numbers.'"')). As the *Meyer* panel explained pointedly:

> The FCC further defined "automatic telephone dialing system" to include
> predictive dialers. *See In the Matter of Rules and Regulations Implementing the
> Tel. Consumer Prot. Act of 1991,* 18 FCC Rcd. 14014, 14091–93 (July 3, 2003).
> "[A] predictive dialer is equipment that dials numbers and, when certain computer
> software is attached, also assists telemarketers in predicting when a sales agent
> will be available to take calls. The hardware, when paired with certain software,
> has the capacity to store or produce numbers and dial those numbers at random, in
> sequential order, or from a database of numbers." *Id.* at 14091. "As one
> commenter points out, the evolution of the teleservices industry has progressed to
> the point where using lists of numbers is far more cost effective. The basic
> function of such equipment, however, has not changed—the *capacity* to dial
> numbers without human intervention." *Id.* at 14092. PRA's predictive dialers fall
> squarely within the FCC's definition of "automatic telephone dialing system."

*Meyer*, 707 F.3d at 1043, *cert. denied*, 133 S. Ct. 2361 (2013). Accordingly, that courts,

including the Ninth Circuit, can and have addressed these very issues is unassailable.[6] As such,

the first factor weighs against granting a stay based on any FCC petitions.

> b.      *Second, while equipment considerations fall within the FCC's field
> of expertise, the Commission has repeatedly ruled that a predictive
> dialer constitutes an ATDS.*

With respect to the second factor, which asks whether the issue involves technical or

policy considerations within the FCC's expertise, the FCC has already found that a predictive

dialer is an ATDS—at least three times. *See, e.g., In re Rules & Regulations Implementing the

Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14092-93 (2003); *In re Rules &

---

[6] Notably, Congress is well aware of these decisions and has considered proposed legislation that
would limit the TCPA's definition of ATDS to include only equipment that uses random or
sequential number generators. *See Mobile Informational Call Act of 2011*, H.R. 3035, 112th
Cong. (2011). In a joint letter to members of Congress, all fifty Attorneys General of the United
States expressed their opposition to the proposed legislation in a letter stating: "Most modern
automatic dialers, however, already use preprogrammed lists. As a result, H.R. 3035 would
effectively allow telemarketers to robo-dial consumers just by avoiding already antiquated
technology." National Association of Attorneys General, Letter to Members of Congress (Dec. 7,
2011), http://law.ga.gov/vgn/images/portal/cit_79369762/179228493Final%20HR3035%20
Letter.pdf). In the face of strong opposition, the proposed legislation was later withdrawn.

*Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008). Numerous federal courts, including the Ninth Circuit, have relied on those rulings. *See, e.g., Meyer*, 707 F.3d at 1043; *Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 729-30 (S.D. Tex. 2012); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129 (W.D. Wash. 2012). Indeed, the FCC could hardly have been clearer, stating first in 2003:

> We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, ***the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment"*** and the intent of Congress.

18 FCC Rcd. at 14092-93 (emphasis added). And again, five years later, the FCC expressly reaffirmed that a predictive dialer is an ATDS:

> In this Declaratory Ruling, ***we affirm that a predictive dialer constitutes an automatic telephone dialing system*** and is subject to the TCPA's restrictions on the use of autodialers.

23 FCC Rcd. at 566 (emphasis added). Moreover, a third FCC order also confirms that a predictive dialer is an ATDS. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 19 FCC Rcd. 19215, 19215 n.1 (2004) ("An automatic telephone dialing system is defined as equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers. ***This includes 'predictive dialers'****. . . .*") (emphasis added). In short, a focus on the automated, human-less nature of the dialing process is key, as the FCC and courts have recognized for the better part of a decade.

Accordingly, considerations of agency expertise don't actually support a stay here.

> c.  *Third, the Capacity Issue it is not a question "particularly within the agency's discretion."*

With respect to the third factor, which considers whether the issue is particularly within the agency's discretion, although Nationstar correctly points out that Congress granted the FCC general authority to interpret the TCPA (Mot. Stay 10), Congress was careful to limit this authority to specific provisions. *See Pimental*, 2012 WL 1458179, at *4 ("Although Defendants

argue that the term 'capacity' within the definition for ATDS . . . [is] not defined in the TCPA, Congress has not placed this task . . . particularly within the agency's discretion. *Cf.* 47 U.S.C. § 227(b)(2)(C) (discretion to determine whether to exempt certain calls to cellular telephones from the TCPA)"). Accordingly, this is not a question that has been specifically reserved for the FCC to decide under the TCPA, and this factor weighs against waiting for the FCC to rule.

> **d.** **Fourth, the Capacity Issue does not present a risk of inconsistent adjudications.**

Nationstar further asserts, without explanation, that "because the TCPA does not define the term 'capacity,' there is a risk of 'significant inconsistent application of FCC rules' on th[e] [capacity] issue." (Mot. Stay 11-12.) But the law on the use of predictive dialers is settled. As explained above, the Ninth Circuit has flatly held that predictive dialers qualify as an ATDS even if they don't have the "present" capacity to store or produce random numbers. (*See* Section (A)(1)(a), *supra*, citing *Meyer*, 707 F.3d at 1043.) Nationstar cites only one authority (a Northern District of Alabama opinion) that has departed from this precedent and held that to meet the definition of ATDS, a system must have "present" capacity to store and call numbers. (Mot. Stay 13) (citing *Hunt v. 21st Mortg. Corp.,* No. 2:12-cv-2697-WMA, 2013 WL 5230061, at *4 (N.D. Ala. Sept. 17, 2013)).[7]

As the court explained in *Sherman*, however, such decisions are manifestly contrary to what the Ninth Circuit has already decided. 2014 WL 369384 ("In rejecting the defendant's argument [that "[t]he question at issue is the *present* capacity of defendant's dialers to store and produce numbers using a random and sequential number generator, not what theoretical, future capacity could be possible if significant time and resources were spent by PRA to modify its dialers,"] the court reaffirmed its previous holding in *Satterfield* that the TCPA focuses on the equipment's capacity rather than present use.") (emphasis in original). Accordingly, a handful of

---

[7] Notwithstanding Nationstar's lone citation to *Hunt*, Plaintiffs acknowledge that two other courts have reached similar conclusions. *See Gragg v. Orange Cab Co., Inc.,* No. 12–cv-0576RSL, 2014 WL 801305, at *2 (W.D. Wash. Feb. 28, 2014); *Dominguez v. Yahoo! Inc.*, No. 13-cv-1887, 2014 WL 1096051, at *5-6 (E.D. Pa. March 20, 2014).

outliers aside, there is little basis for concluding that the lack of any FCC determination in this regard has resulted in inconsistent adjudications of such import that a stay should be issued.

In short, the Ninth Circuit—performing its traditional function of interpreting statutes—has consistently held that predictive dialers (like the equipment that discovery would demonstrate Nationstar used to make the calls at issue in this case) constitute ATDSs under the TCPA. While the question is one that falls within the FCC's expertise, the issue was not specifically delegated to the FCC and, in any case, the FCC has held three separate times that predictive dialers are ATDSs. And although a handful of courts have taken the "present" capacity bait, there's no justification for departing from the Ninth Circuit's binding precedent to the contrary. As such, no stay should be granted based on the Capacity Issue.

> *e.*     *This Court should decline to follow those judges who have stayed cases pending the FCC petitions at issue and who continue to await various rulings.*

Respectfully, this Court shouldn't follow the four courts Nationstar cites as having recently granted stays based on the pending capacity decisions. (*See* Mot. Stay 12-13.) First, in *Mendoza v. UnitedHealth Grp. Inc.*, No. 13-cv-1553-PJH, 2014 WL 722031 (N.D. Cal. Jan. 6, 2014), Judge Hamilton stated that "[a]s the issue raised by MD247 directly overlaps with the legal issues before the court by way of plaintiff's complaint, the court concludes that the FCC is in the process of utilizing its recognized expertise to consider issues pending before the court. As such, the prerequisites for application of the primary jurisdiction doctrine are satisfied . . . ." Such a broad reading of the primary jurisdiction doctrine is inadvisable, as it would require a stay whenever a petition is on file with the FCC that overlaps with the lawsuit and may involve the FCC's recognized expertise. This would merely encourage more FCC petitions to be filed "challenging" already established rules—thus ensuring that few, if any, lawsuits could move forward and that the FCC's backlog remains insurmountable. Further, although Judge Hamilton relied on the fact that the FCC had indicated in letters back in September 2013 that a decision would be made "soon," no decision has been issued in the six months since the Court entered the stay in *Mendoza*.

Second, the court in *Higgenbotham v. Diversified Consultants, Inc.*, No. 13-cv-2624-JTM, 2014 WL 1930885 (D. Kan. May 14, 2014) concluded "the statutory reference to 'capacity' is unclear." *Id.* at *3. As explained above, however, this isn't true in the Ninth Circuit, where the law is settled and a distinction based on "present" capacity has been rejected. (*See supra* Section (III)(A)(1)(a) (citing *Meyer*, 707 F.3d at 1043 and *Satterfield*, 569 F.3d at 951).)

*Hurrle v. Real Time Resolutions, Inc.*, No. 13-cv-5765-BHS, 2014 WL 670639 (W.D. Wash. Feb. 20, 2014) likewise offers no help to Nationstar. In that case, the court's one-page opinion states "[t]he complaint alleges that Real Time implements an autodialer to call debtors regarding unpaid debt. The law is unclear whether Congress intended the TCPA to prevent this activity. Telemarketing is one activity while collecting debt from known debtors seems to be a wholly separate activity." *Id.* at *1. In the instant case, Plaintiffs Jordan and Ruggles allege that they never had any debt with Nationstar, and therefore are not "known debtors." (*See* Compl. ¶¶ 32, 52.) *Hurrle* therefore provides no support for staying the case as to them. Likewise, and as set forth below, *infra* Section (III)(C), it is highly questionable whether the FCC will use the CI Petition as a means for revisiting its prior refusal to provide a total exception to debt collectors for calls made. In short, while the TCPA already exempts debt collectors from TCPA prohibitions on "telemarketing" such as complying with certain Do Not Call list rules, debt collectors are still liable for making "any call" or "any telephone call" that violates § 227(b)(1)(A) or (b)(1)(B). The FCC has refused to grant a broader exception. Hence, because the stay in *Hurrle* was based on misunderstandings regarding the TCPA's application to debt collection activity, its reasoning shouldn't be applied here.

Finally, the Court shouldn't be persuaded to stay the case in light of *Passero v. Diversified Consultants, Inc.*, No. 13-CV-338C, 2014 WL 2257185 (W.D.N.Y. May 28, 2014). In that matter, and contrary to the explanation set forth above, *supra* Section (III)(A)(1)(a), Judge Curtin found that the autodialer questions raised by the defendant in that case fell "well outside the conventional experience of this court." *Id*. at *2. While a colorable argument may exist that

such a finding was reasonable in light of a dearth of Second Circuit guidance, given controlling Ninth Circuit precedent interpreting these terms, this Court should reach the opposite conclusion.

Ultimately, there exists no basis for granting any stay based upon the Capacity Issues. To do so would run counter to the factors traditionally considered when applying the primary jurisdiction doctrine and only result in the case remaining stagnant on the Court's docket.

> ### f. *Nationstar fails to show that any ruling from the FCC, which could take years to receive, is actually imminent.*

Nationstar further argues, with respect to the capacity issue only, that an FCC ruling is "imminent." (Mot. Stay 14.) For support, Nationstar cites a series of letters circulated by then-acting director Mignon Clyburn from September 2013—over ten month ago—indicating that with respect to the CI Petition, the Commission expects "to resolve it soon." (*See* Exhibit D to the Declaration of Jack Gindi in Support of Motion to Stay ("Gindi Decl."), Dkt. 35.) Nationstar also cites a blog-post from Commissioner Michael O'Reilly, where he indicates that the Commission "needs to address" the "inventory of petitions as soon as possible." (Gindi Decl., Ex. K.) Neither of these sources actually suggests that decisions are imminent.

Indeed, the CI Petition has been on file for over two years. The letter from acting director Clyburn was sent almost a year ago and it stated the Commission was working to resolve the matter "soon." Commissioner O'Reilly's blog-post is not an official pronouncement by the FCC that decisions are forthcoming; rather, it is merely an indication that even inside the FCC there is recognition that things move at a slow pace and that Commissioner O'Reilly sees a need to move more quickly. That said, his post doesn't change the fact that such expressions of need don't signal that action is actually being taken.

Likewise, Nationstar's reliance on *Glauser v. Twilio, Inc.*, No. 11-cv-2584 PJH, 2012 WL 259426, at *2-3 (N.D. Cal. Jan. 27, 2012) is seriously misplaced. (Mot. Stay 14.) Although Judge Hamilton granted a stay based on the CI Petition and a separate petition filed by co-Defendant GroupMe, consideration by the FCC was taking so long that GroupMe abandoned its arguments based on the CI Petition and received a ruling from the FCC on its consent question in

March 2014 and the stay was thereafter lifted. Had the arguments based upon the CI Petition been pursued and the stay remained in effect, the case would have been stayed for over a year and a half.

In sum, there is no basis for concluding that the CI, YouMail, or PACE Petitions will be decided any time "soon" as that term is commonly understood.

### 2. Courts also have the conventional experience of interpreting the meaning of the term "called party" and have consistently interpreted it to mean the subscriber of the telephone service at the time the call is placed.

As for Nationstar's second issue—the Reassigned Number Issue—it also implicates a matter of statutory interpretation that has already been interpreted by courts. For example, in *Soppet v. Enhanced Recovery Co., LLC*, Judge Easterbrook faced the question of debt collection calls to reassigned numbers (which Nationstar insists must be determined by the FCC). 679 F.3d 637, 639 (7th Cir. 2012), *reh'g denied* (May 25, 2012) ("Neither Soppet nor Tang ever consented to receive automated or recorded calls from Enhanced Recovery—but the two Customers did agree to receive calls at the numbers later assigned to Soppet and Tang."). The *Soppet* panel analyzed all seven occurrences of "called party" in Section 227 and—finding that none of them supported a reading that equated the consent of the called party with that of the person the debt collector allegedly intended to call (but finding that four "unmistakably denote the current subscriber")—concluded rhetorically: "The phrase 'intended recipient' does not appear anywhere in § 227, so what justification could there be for equating called party' with 'intended recipient of the call'?" *Id.* 640.

Likewise, the Eleventh Circuit in *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1252 (11th Cir. 2014) concluded that the intended recipient of a phone number that has been reassigned, as Nationstar alleges likely occurred in this case with respect to Plaintiffs Ruggles and Jordan, is not the "called party"—the current subscriber of the service called is. *Id.* 1252 ("We accordingly reject State Farm's argument that the "intended recipient" is the "called party" referred to in 47 U.S.C. § 227(b)(1)(A).").

Second, like the capacity issue, Congress has not specifically delegated the question of reassigned numbers to the FCC, nor is the FCC's expertise needed to interpret the statute or provide workable solutions for businesses like Nationstar. As the Seventh Circuit explained in *Soppet,* several options remain for debt collectors that wish to use predictive dialers.[8] As such, there is no need to wait however long it may take for the FCC to rule on the UHC and ACA International petitions (neither of which is actually discussed by Nationstar). Rather, the question of reassigned phone numbers is one of statutory interpretation that may be handled by the Court (and has been handled consistently by other Courts).

Ignoring the fact that the Ninth Circuit[9] could readily interpret these issues like the Seventh and Eleventh Circuits have, Nationstar cites three cases, *Heinrichs v. Wells Fargo Bank, N.A.*, No. 13-cv-05434-WHA, 2014 WL 2142457 (N.D. Cal. Apr. 15, 2014), *Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343-TEH, 2014 WL 1942829 (N.D. Cal. May 12, 2014), and *Higgingbotham v. Hollins*, No. 14-cv-2087-JTM-TJJ, 2014 WL 2865730 (D. Kan. June 24, 2014) where courts have decided to wait it out while the FCC considers the United Healthcare and ACA International Petitions. This Court should respectfully decline to join these other courts. For starters, in *Heinrichs*, Judge Alsup simply concluded "Section 227(b)(2) grants the

---

[8] "Bill collectors need not abandon predictive dialers. Other options remain:

- Have a person make the first call (§ 227(b)(1) is limited to automated calls), then switch to a predictive dialer after verifying that Cell Number still is assigned to Customer.
- Use a reverse lookup to identify the current subscriber to Cell Number.
- Ask Creditor, who obtained Customer's consent, whether Customer still is associated with Cell Number—and get an indemnity from Creditor in case a mistake has been made. (Indemnity may be automatic under ¶ 10 of the *2008 TCPA Order,* which states that calls placed by a third-party collector on behalf of a creditor are treated as having been made by the creditor itself.)"

*Soppet*, 679 F.3d at 642.

[9] To be sure, district courts in the Ninth Circuit have generally rejected the "intended recipient" argument Nationstar anticipates advancing. *See Olney v. Progressive Cas. Ins. Co.*, No. 13-cv-2058, 2014 WL 294498, at *3 (S.D. Cal. Jan. 24, 2014) (Judge Gonzalo P. Curiel) (standing under TCPA not limited to intended recipient); *Gutierrez v. Barclays Group,* No. 10-cv-1012, 2011 WL 579238, at *5 (S.D. Cal. Feb. 9, 2011) (Judge Dana M. Sabraw) (adopting subscriber definition)

FCC authority to promulgate regulations to implement the TCPA." 2014 WL 2142457, at *1. While it is true that the FCC can issue certain regulations, Congress did not grant it total authority—it is generally limited to proscribing exceptions for certain businesses and entities. *See* 47 U.S.C. § 227(b)(2)(A)-(G). Judge Alsup basically ignored the factor that asks whether the issue is one that falls generally within the conventional experience of judges (although he acknowledged that courts have been mostly consistent in rejecting the "intended recipient" interpretation).[10]

Similarly, in *Barrera* Judge Henderson found, while applying the test for primary jurisdiction as articulated in *Syntek* (*see supra* n.4), that the TCPA granted the FCC broad discretion to interpret and enforce the TCPA. 2014 WL 1942829, at *2 (citing *Charvat v. EchoStar Satellite, LLC,* 630 F.3d 459, 466-67 (6th Cir. 2010)). Like Judge Alsup, Judge Henderson overlooked that the issue is one of statutory interpretation, which falls well within the purview of judges, and that unlike the issue of whether the TCPA grants a blanket exemption for debt collectors, the Reassigned Number Issue is not one that has been delegated specifically to the FCC for resolution.

Finally, the court in *Higgingbotham* provides almost no analysis other than to cite other courts that have granted stays. *See* 2014 WL 2865730. As such, this Court shouldn't find the *Higgingbotham* reasoning all that persuasive.

Because the Reassigned Number Issue doesn't pass the four-factor test, primary jurisdiction does not support a stay here.

### 3. Lastly, courts are well equipped to determine whether the TCPA extends to debt collection activities—and have done so consistently following FCC guidance.

For its final issue, the Debt Collector Issue, Nationstar claims a stay is warranted in light of questions regarding whether the TCPA applies to debt collection activity in the first place.

---

[10] It is worth noting that Judge Alsup only granted a six-month stay, which could be even shorter if the FCC rules in the interim. *Heinrichs*, 2014 WL 2142457, at *2 ("[T]his action will be stayed until the sooner of six months or such closer time as the FCC decides to act or rule in such a way as to eviscerate the pending action.").

(*See* Mot. Stay 17-18.) This is incorrect.

Admittedly, the providing of express exemptions under the TCPA has been committed to the discretion of the FCC. *See* 47 U.S.C. § 227(b)(2)(C). As such, as it pertains to the Debt Collector Issue only, it appears that Nationstar can satisfy the second and third factors under the primary jurisdiction test (whether debt collection is expressly within the FCC's field of expertise and is reserved for the FCC to decide). However, that still isn't enough to warrant staying even this part of the case. First, Nationstar can't point to a petition pending before the FCC where this issue has actually been raised such that the Court needs to await a ruling. That is, although Nationstar cites to cases saying this issue is before the FCC, it has not, and cannot, identify any petition that actually raises the issue of the TCPA's application to debt collection calls more generally. (*See* Mot. Stay 17-18.)

The cases Nationstar cites (*Hurrle*, 2014 WL 670639, *Higgingbotham*, 2014 WL 2865730, and *Passero*, 2014 WL 2257185) seemingly rely on the CI Petition, but a careful read of that petition shows the issue of debt collection isn't raised directly. Rather, any reference to debt collection is tied to Communication Innovator's discussion regarding the use of its dialing equipment. At best, therefore, the CI Petition merely presents a chance for comment on this point—it isn't the focus of the petition. *See Higgenbotham*, No. 13-cv-02624-JTM-JPO, Dkt. 22, n.12) (noting that, "Defendant asserts that whether the TCPA applies to non-telemarketing activity (i.e., debt collection activity) is an open question. The court disagrees, but recognizes that the FCC will have a chance to clarify its position in this regard in response to the Communication Innovators petition."). It is therefore questionable whether the FCC will view the CI Petition as a vehicle for revisiting its prior determinations regarding the TCPA's application to debt collectors.

Second, even if debt collection in general was squarely before the FCC, as with the Capacity Issue the FCC has already held that debt collection calls do not enjoy a *carte blanche* exclusion from the TCPA. The FCC's 2008 guidance explains:

> We also reiterate that the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. We note that this prohibition applies regardless of the content of the call, and is not limited only to calls that constitute "telephone solicitations." However, we agree with ACA and other commenters that calls solely for the purpose of debt collection are not telephone solicitations and do not constitute telemarketing. Therefore, calls regarding debt collection or to recover payments are not subject to the TCPA's separate restrictions on "telephone solicitations."

*In the Matter of Rules & Regulations*, 23 F.C.C. Rcd. at 565, n.42 (2008) (explaining that the National Do-Not-Call List does not apply to calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3).) Hence, debt collectors already enjoy a limited exclusion—and it would contradict the TCPA's plain language barring "any call" made using an ATDS without consent (or "any telephone call" with a pre-recorded voice in the case of landlines) to exempt them wholesale.

Third, and contrary to the *Hurrle* decision, courts in the Ninth Circuit (and elsewhere) have otherwise consistently applied the rule that the TCPA applies to debt collectors. *See Iniguez v. The CBE Grp.,* 969 F. Supp. 2d 1241, 1247 (E.D. Cal. 2013), *recons. denied* (Dec. 5, 2013) ("The TCPA therefore applies to debt collectors and they may be liable for offending calls."); *Blair v. CBE Group Inc.,* No. 13-cv-134-MMA(WVG), 2013 WL 2029155, at *3 (S.D. Cal. May 13, 2013); *Robinson v. Midland Funding,* No. 10-cv-2261-MMA(AJB), 2011 WL 1434919, at *5 (S.D. Cal. Apr. 13, 2011); *Olney*, 2014 WL 294498 (S.D. Cal. Jan. 24, 2014); *see also Higgenbotham*, No. 13-cv-02624-JTM-JPO at 2-3 ("The 2008 Order made clear that the TCPA applies to calls made for the purpose of collecting a debt.").

In light of the ability of most courts to follow the FCC's clear guidance from 2008 that the prohibition on calling cellphones without consent "applies regardless of the content of the call" —which was only six years ago—there is little basis for staying the instant case in the off-chance that the FCC will use the CI Petition to upend its prior decision. *See* 23 F.C.C. Rcd. at 565, n.42.

**B. A Stay is Inappropriate in any Case Because any FCC Decision Wouldn't Be Applied Retroactively.**

As an additional point, any change to the FCC's long-standing rules that a predictive dialer is considered an ATDS and that the TCPA applies to debt collection calls would likely not be retroactive. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that agency rules are generally not to be applied retroactively). The predictive dialer used by Nationstar was considered an ATDS at the time the calls were made, and Nationstar is liable for its past conduct regardless of whether the FCC rules at some future date that the predictive dialer it used is exempt from the TCPA going forward. *See Frydman v. Portfolio Recovery Associates, LLC*, No. 11-cv-524, 2011 WL 2560221, at *7 (N.D. Ill. June 28, 2011) (refusing to apply primary jurisdiction doctrine, in part because "[w]hatever the FCC decides . . . will not affect plaintiffs' claims because any ruling likely will be prospective only"). As such, any stay (really, none should be issued) should be limited to claims for injunctive relief only.

**C. Considerations Applicable to Stays More Generally Weigh Against Freezing the Litigation Here.**

As a final point, considerations regarding stays more generally caution significantly against issuing one in the instant case. When granting a stay, the Court must weigh "the competing interests which will be affected by the granting or refusal to grant a stay." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citing *CMAX Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)). "Among those competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.* "The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

Nationstar ignores these considerations wholesale, when the simple truth is that a stay only acts to prejudice the Plaintiffs. *See Pagtalunan v. Galaza*, 291 F.3d 639, 643 (9th Cir. 2002) ("Unnecessary delay inherently increases the risk that witnesses' memories will fade and

evidence will become stale.") (citing *Sibron v. New York,* 392 U.S. 40 (1968)). Further, given the nature of complex class actions, it is often unclear until later stages of a case whether specific materials are relevant. The earlier they are identified, the earlier their preservation may be ensured. If Nationstar had its way, the case would simply go nowhere, when the most appropriate course would be for the case to proceed and, if the FCC rules in a way that Nationstar believes is relevant, it may notify the Court at that time.

## IV.    CONCLUSION

Although under appropriate circumstances a Court should stay litigation pending decisions by appropriate agencies, there's simply no basis for doing so here. None of the issues Nationstar raises—capacity, reassigned numbers, or debt collection—are issues of first impression that haven't been addressed by either the FCC, the courts, or both, in the past. Rather, each issue has been decided repeatedly—Nationstar simply disagrees with the outcome. Furthermore, staying litigation pending an FCC decision, which could take years to be issued, has become somewhat of a game for defendants—as the number of stays that are granted increases, so too does the number of petitions filed seeking to re-litigate and legislate already settled questions. As such, and because a stay would only allow Nationstar to continue its unlawful conduct while discovery grows stale, this Court should deny Nationstar's Motion for Stay and award such additional relief as it deems necessary and just.

**ROBERT JORDAN**, **SEAN HALBERT**, and
**DANA SKELTON, and VANESSA RUGGLES**
individually and on behalf of classes of similarly
situated individuals,

Dated: July 24, 2014

By: __/s/ Steven L. Woodrow_____
     One of Plaintiffs' Attorneys

Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Steven L. Woodrow (Admitted Pro Hac Vice)
swoodrow@edelson.com
Megan Lindsey (Admitted Pro Hac Vice)
mlindsey@edelson.com
EDELSON PC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Tel: 303.357.4878
Fax: 303.446.9111

Jay Edelson*
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: 312.589.6380
Fax: 312.589.6378

Stefan Coleman, Esq.*
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, LLC
201 S Biscayne Blvd, 28th Floor
Miami, Florida 33131
Tel: 877.333.9427
Fax: 888.498.8946

* Pro hac vice admission to be filed

Michael P. Sousa, SBN 229416
sousam@sbcglobal.net
LAW OFFICES OF MICHAEL P. SOUSA, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
Tel: 858.453.6122, ext. 15
Fax: 858.453.2155

Matthew G. English, SBN 204869
mgelaw@gmail.com
LAW OFFICES OF MATTHEW G. ENGLISH
941 Orange Ave. #344
Coronado, CA 92118
Tel: 619.944.8568

Douglas J. Campion, SBN: 75381
doug@djcampion.com
Law Offices of Douglas J. Campion, APC
409 Camino Del Rio South, Suite 303
San Diego, CA 92108
Tel: (619) 299-2901
Fax: (619) 858-0034

# CERTIFICATE OF SERVICE

I, Megan Lindsey, an attorney, hereby certify that I served *Plaintiffs' Opposition to Defendant Nationstar Mortgage LLC's Motion for Stay Pursuant to the Primary Jurisdiction Doctrine (Dkt. 33.)* by causing true and accurate copies of such papers to be transmitted to the persons shown below via electronic mail and First Class Mail on July 24, 2014 as follows:

Abraham Joshua Colman
acolman@reedsmith.com
Felicia Yangru Yu
fyu@reedsmith.com
Jack J. Gindi
jgindi@reedsmith.com
Raymond Yoon Ho Kim
rkim@reedsmith.com
Reed Smith LLP
355 South Grand Avenue
Los Angeles, CA 90071


/s/ Megan L. Lindsey