UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT JORDAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONSTAR MORTGAGE LLC, <br><br> Defendant. | Case No. 14-cv-00787-WHO <br><br> **ORDER LIFTING STAY, DENYING DEFENDANT'S MOTION FOR STAY, AND SETTING CASE MANAGEMENT CONFERENCE** <br><br> Re:  Dkt. Nos. 33, 48 |

Defendant Nationstar Mortgage LLC ("Nationstar") moves for a stay of this case on the ground that the Federal Communications Commission ("FCC") has primary jurisdiction to decide the following three issues: (1) whether dialing equipment that lacks the current capacity for random or sequential dialing constitutes an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, ("TCPA"); (2) whether TCPA liability arises when a cell phone number is reassigned from someone who consented to calls to someone who did not without notice to the caller; and (3) whether the TCPA applies to debt collection calls. Dkt. No 33.  Nationstar asserts that petitions pending before the FCC address these issues and that a relevant agency decision is "imminent." *Id.*

On September 4, 2014, I issued an order postponing the decision on Nationstar's motion and staying the case until October 15, 2014.  Dkt. No. 48.  I did so to allow time for the FCC to respond to Judge Alsup's request for a status update on the pending petitions, which he issued in another TCPA case, *Heinrichs v. Wells Fargo Bank N.A.*, No. 13-05434-WHA (N.D. Cal. Nov. 22, 2013).  The FCC did respond, but gave no indication that it would resolve the matters raised by the petitions in the near term, if ever.  *See Heinrichs*, No. 13-05434-WHA, Dkt. No. 58.

Having considered the FCC's response to Judge Alsup and the relevant filings by the parties in this case, like Judge Alsup I LIFT THE STAY.  Application of the primary jurisdiction

doctrine is not warranted here.  Courts in this circuit have ruled on the meanings of the three terms at issue here consistently and without the need to defer to the technical expertise of the FCC.  As reflected in the FCC's response to Judge Alsup, the evidence that the FCC will rule "imminently" on the pending petitions is equivocal at best.  It is not clear that rulings on the petitions would be determinative to this case because the questions presented in the petitions appear different from the issues presented here.  The obligation of the court to provide a just, speedy and inexpensive determination of this case further weighs against the possible benefits of awaiting an FCC decision on the petitions.  See Fed. R. Civ. P. 1.  Nationstar's motion for stay is DENIED.

## FACTUAL BACKGROUND

Nationstar is a mortgage loan servicer.  It sends monthly mortgage statements, collects payments, pays the owners/investors of the notes, calculates borrower escrows, and performs other functions and duties attendant to the servicing of its mortgage loan portfolio.  In the course of its business, Nationstar makes thousands of telephone calls to consumers using auto-dialer equipment.  Dkt. No. 31, Consolidated Class Action Complaint ("Compl.") ¶ 59.  Nationstar's calls are made for the purpose of collecting debt, to remind consumers to pay their mortgage, and for other, non-debt collection reasons.  *Id*. ¶ 16.  The calls feature pre-recorded messages instead of live operators.  *Id*. ¶ 18

Plaintiffs Robert Jordan, Sean Halbert, Dana Skelton, and Vanessa Ruggles are four consumers who have received calls from Nationstar.  Plaintiffs Jordan and Ruggles do not have mortgages with Nationstar, they have not provided their phone numbers to Nationstar, and the calls they have received have been unsolicited and without their consent.  *Id*. ¶¶ 2, 24, 30, 52.  When Plaintiff Jordan answered the calls he heard a pre-recorded voice identifying the caller as Nationstar and requesting that he call Nationstar back.  When Jordan called Nationstar back to stop the calls, he was greeted with another prerecorded message directing him to input his telephone number and Social Security number to identify his loan.  Because Jordan does not have a loan with Nationstar, he was unable to get past these requests.  Pressing "0" only brought him back to the main menu.  *Id*. ¶ 28.

Like Jordan, plaintiff Ruggles received numerous calls from Nationstar.  She called a

2

separate number where she reached a Nationstar representative and requested that the calls stop. The representative informed Ruggles that it would take thirty days to process her request to stop the calls. Despite her request, Nationstar called Ruggles approximately twenty-three times between November 2013 and December 4, 2013. During another call in or around November 2013, a Nationstar representative told Ruggles that Nationstar could keep calling because the calls were courtesy calls, as opposed to solicitations. *Id*. ¶ 50.

Plaintiffs Halbert and Skelton, a married couple, have a mortgage held by Nationstar. *Id*. ¶ 33. In March 2012, Halbert and Skelton each began receiving numerous phone calls on their cellular telephones "reminding" them to make payments, even though they had made no payments outside of their grace period. Many of these calls featured an artificial or pre-recorded voice. *Id*. ¶ 35. Plaintiffs Halbert and Skelton called Nationstar in March 2012 and requested to be taken off the call list because their account was in good standing. The customer service representative verified that Halbert and Skelton's payments had not been late and said that they would not be called again. *Id*. ¶ 37. Nevertheless, in April 2012, the calls resumed. *Id*. ¶ 38. Halbert and Skelton submitted a formal complaint to the Better Business Bureau stating that they "would like the illegal collection calls to stop." *Id*. ¶ 39. They received a letter from Nationstar which stated, "We received notification from the Better Business Bureau on April 11, 2012 regarding your request to cease and desist collection calls on the above mentioned account. Please accept our apology if you have experienced any inconvenience in this matter. Your account has been coded to cease the collection calls." *Id*. ¶ 40. The calls ceased for approximately six months and then resumed. *Id*. ¶ 41.

**PROCEDURAL BACKGROUND**

Jordan, Halbert, Skelton, and Ruggles filed two putative class action lawsuits against Nationstar challenging the unsolicited telephone calls under the TCPA. One action, *Ruggles v. Nationstar Mortgage LLC*, No. 14-cv-00363 (C.D. Cal. Feb. 26, 2014), was filed in the United States District Court for the Central District of California. The other, *Jordan v. Nationstar LLC*, No. 14-cv-00787-WHO (N.D. Cal. Feb. 21, 2014), was filed in the Northern District. On May 16, 2014, the court in *Ruggles* issued an order relating the case to *Jordan* and transferring *Ruggles* to

the Northern District. Both cases seek redress for substantially the same class of people for essentially the same claims, are based on similar factual allegations, and are against the same defendant.

At the case management conference held on May 27, 2014, I granted plaintiffs' oral motion to consolidate the cases. Dkt. No. 27. On June 23, 2014, plaintiffs filed a consolidated complaint alleging four causes of action for violations of the TCPA resulting from unsolicited telephone calls made through the use of an automated telephone dialing system or using an artificial or pre-recorded voice. Dkt. No. 31. The complaint defines four putative classes:

No Mortgage Cell Phone Class: All individuals in the United States to whom Defendant (1) placed a non-emergency telephone call to his or her cellular telephone from February 21, 2010 to the present; (2) that was made utilizing an automatic telephone dialing system and / or a prerecorded or artificial voice; (3) which related to Defendant's products or services; (4) where Defendant does not have a record of consent to place telephone calls to his or her cellular telephone number; and (5) who did not have a mortgage loan serviced or owned by Nationstar when the call was made.

Mortgage Cell Phone Class: All individuals in the United States to whom Defendant (1) placed a non-emergency telephone call to his or her cellular telephone from February 21, 2010 to the present; (2) that was made utilizing an automatic telephone dialing system and / or by a prerecorded or artificial voice; (3) which related to Defendant's products or services; (4) where Defendant does not have a record of consent to place telephone calls to his or her cellular telephone number; and (5) who had a mortgage loan serviced or owned by Nationstar when the call was made.

Opt-Out Class: All individuals in the United States to whom Defendant (1) placed a non-emergency telephone call to his or her cellular telephone from February 21, 2010 to the present; (2) that was made utilizing an automatic telephone dialing system and / or a prerecorded or artificial voice; (3) which related to Defendant's products or services; (4) and, following such calls, he or she made a request to Defendant that he or she no longer receive telephone calls from Defendant; and (5) thereafter Defendant placed additional telephone calls to his or her cellular telephone.

Landline Class: All individuals in the United States to whom Defendant (1) placed a non-emergency telephone call to his or her residential landline phone from February 21, 2010 to the present; (2) that was made utilizing a prerecorded or artificial voice; (3) which related to Defendant's product or services; (4) where Defendant does not have a record of consent to place telephone calls to his or her landline telephone number, and (5) who did not have a mortgage loan serviced or owned by Nationstar when the call was made.

4

*Id.* ¶ 58.

On July 10, 2014, Nationstar filed its motion to stay.  Dkt. No. 33.  I issued an order postponing the decision on Nationstar's motion but temporarily staying the case until October 15, 2014 in light of Judge Alsup's request in *Heinrichs* for a status update from the FCC.  Dkt. No. 48. I also instructed the parties to submit a joint statement to me on October 15, 2014 indicating any new information concerning the relevant FCC petitions.  *Id.*  On September 26, 2014, counsel for the FCC submitted a status report to Judge Alsup stating that it "does not anticipate that the agency will issue a final decision on...the pending petitions by the middle of October 2014" and that it "is [not] in a position to predict when the [FCC] will vote to approve a final order on this matter."  *Heinrichs*, No. 13-cv-05434-WHA, Dkt. No. 58.  Judge Alsup subsequently lifted the stay in *Heinrichs*.  *Id.* at Dkt. No. 62.

As instructed, the parties in this case filed a joint statement on October 15, 2014.  Dkt. No. 50.  Nationstar points to FCC Chairman Tom Wheeler's August 28, 2014 responses to questions from the United States House of Representative's Subcommittee on Communications and Technology, in which Wheeler states that the FCC is reviewing the pending petitions regarding the TCPA and plans to resolve "more than one-third of them...within the next several months."  *Id.* at 2.  Based on this and other representations from the FCC, Nationstar states that it believes that the agency will issue a ruling on the meaning of at least one of the three contested terms within the next six months.  *Id.* at 4.  Nationstar also cites to four recent district court decisions granting stays of TCPA lawsuits in light of the pending petitions.  *See Pickens v. Am. Credit Acceptance, LLC*, No. 14-00201, 2014 WL 4662512 (S.D. Ala. Sept. 19, 2014); *Wahl v. Stellar Recovery, Inc.*, No. 14-cv-06002, 2014 WL 4678043 (W.D.N.Y. Sept. 18, 2014); *Lambert v. Buth-Na-Bodhaige, Inc.*, No. 14-cv-00051, 2014 WL 4187250 (E.D. Cal. Aug. 21, 2014); *Lee v. loanDepot.com, LLC*, 14-cv-01084, 2014 WL 4145504 (D. Kan. Aug. 20, 2014).  Plaintiffs note that "discovery is growing stale," that "witness['s] memories are fading," and that even if Nationstar is correct and an FCC decision is forthcoming, lifting the stay now will not preclude Nationstar from relying on the FCC's new guidance whenever it finally is issued.  *Id.* at 8.

**LEGAL STANDARD**

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). This "prudential" doctrine enables a court to determine that "an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Id.* (citing *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 782 (9th Cir. 2002)). "[I]t is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (citations and quotation marks omitted).

Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *Davel Comm'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086 (9th Cir. 2006), the Ninth Circuit has considered whether (1) the issue is within the "conventional experiences of judges" or "involves technical or policy considerations within the agency's particular field of expertise," (2) the issue "is particularly within the agency's discretion," and (3) "there exists a substantial danger of inconsistent rulings." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1048-49 (9th Cir. 2011). A court also must balance the parties' need to resolve the action expeditiously against the benefits of obtaining the federal agency's expertise on the issues. *Maronyan*, 658 F.3d at 1049. If applicable, the court can either stay proceedings or dismiss the case without prejudice. *Syntek*, 307 F.3d at 782.

**DISCUSSION**

Congress enacted the TCPA to protect consumer privacy interests. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). The three elements of a TCPA claim are: (1) the defendant called a telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent. *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)(1)). "Congress has delegated the FCC with

United States District Court
Northern District of California

1    the authority to make rules and regulations to implement the TCPA." *Satterfield v. Simon &*

2    *Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009).

3         Nationstar asserts that the FCC has primary jurisdiction to decide three legal issues that,

4    according to Nationstar, govern the outcome of this case: (1) whether dialing equipment that lacks

5    the current capacity for random or sequential dialing constitutes an "automatic telephone dialing

6    system" as defined by the TCPA; (2) whether TCPA liability arises when a cell phone number is

7    reassigned from someone who consented to calls to someone who did not without notice to the

8    caller; and (3) whether the TCPA applies to debt collection calls.  Dkt. No. 33.  Nationstar argues

9    that an FCC ruling on these issues is "imminent," that the FCC's expertise is necessary to

10   determine these issues, and that there is a significant risk of inconsistent rulings on all three issues

11   if a stay is not granted.  *Id.*

12        Plaintiffs contend that the issues involve questions of statutory construction rather than

13   agency expertise, that there is little risk of inconsistent adjudications, and that no FCC ruling is

14   imminent.  Dkt. No. 37.

15   **A.  Definition of "Capacity"**

16        The TCPA defines an "automatic telephone dialing system" as "equipment that has the

17   capacity - (A) to store or produce telephone numbers to be called, using a random or sequential

18   number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  The TCPA does not

19   define the term "capacity."  The FCC, which Congress vested with authority to prescribe

20   regulations implementing the TCPA's requirements, has interpreted an ATDS as "cover[ing] any

21   equipment that has the specified capacity to generate numbers and dial them without human

22   intervention, regardless of whether the numbers called are randomly or sequentially generated or

23   come from calling lists."  *In re the Rules and Regulations Implementing the Telephone Consumer

24   Protection Act of 1991*, 18 FCC Rcd. 14014, 14017 (2003). The FCC has also ruled that

25   "predictive dialers" fall "within the meaning and statutory definition of 'automatic telephone

26   dialing equipment' and the intent of Congress."  *Id*.  Predictive dialers have hardware that, "when

27   paired with certain software, has the capacity to store or produce numbers and dial those numbers

28   at random, in sequential order, from a database of numbers."  *Id*.  In 2008, the FCC issued an

order affirming its ruling that a predictive dialer is an ATDS subject to the TCPA's restrictions. *In re the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 566 (2008). The FCC states that "the basic function of such equipment . . . [is] the capacity to dial numbers without human intervention." *Id.*

According to Nationstar, the FCC's 2003 and 2008 orders have created uncertainty as to whether all predictive dialers meet the definition of an ATDS, or whether predictive dialers that lack the "current capacity" for random or sequential number generation do not meet the definition of an ATDS. As recently stated by a judge in this district, the question is "whether the dialing equipment's present capacity is the determinative factor in classifying it as an ATDS, or whether the equipment's potential capacity with hardware and/or software alterations should be considered, regardless of whether the potential capacity is utilized at the time the calls are made." *Mendoza v. UnitedHealth Grp. Inc.*, No. 13-cv-01553-PJH, 2014 WL 722031, at *2 (N.D. Cal. Jan. 6, 2014).

Nationstar asserts that its dialing equipment lacks the current capacity for random or sequential number generation. At the time the alleged calls were initiated to the plaintiffs, the dialing equipment used by Nationstar lacked the current capacity to "store or produce numbers to be called, using a random or sequential number generator . . . and to dial such numbers," as required to constitute an ATDS. Lemon Decl., ¶¶ 2-3. Nationstar's dialing equipment was only capable of generating calls from a list of known telephone numbers that was downloaded onto its equipment. *Id.* ¶ 4. "Once numbers are downloaded into Nationstar's dialing equipment, an employee must manually press a button in order to initiate calls." Lemon Supp. Decl., ¶ 3.

**1. Pending FCC Petitions**

There are at least four petitions pending before the FCC requesting that the FCC address the meaning of "capacity." In the *Petition for Rulemaking of ACA International*, CG Docket No. 02-278 (filed Jan. 31, 2014), ACA International asks the FCC to, "(1) confirm that not all predictive dialers are categorically automatic telephone dialing systems ('ATDS' or 'autodialers'); [and] (2) confirm that 'capacity' under the TCPA means present ability [to store, produce or dial phone numbers]." On February 21, 2014, the FCC issued a public notice seeking comment on the ACA International petition. The FCC's deadline for reply comments closed on March 24, 2014.

United States District Court
Northern District of California

Another petition, *In re YouMail's Petition for Expedited Declaratory Ruling and Clarification*, CG Docket No. 02-278 (filed April 19, 2013), asks that "the Commission affirmatively state that only equipment that has a current capacity to store and produce telephone numbers to be called using a random or sequential number generator" should be considered an ATDS.  Gindi Decl., Ex. E.  On June 25, 2013, the FCC issued a public notice seeking comment on YouMail's petition. *See* Gindi Decl., Exh. F.  Comments were accepted through August 2013.  In the petition *In re Professional Association for Customer Engagement's Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278 (filed October 18, 2013), PACE asks the FCC to "(1) define the term 'capacity' as used in the [TCPA] and the Commission's TCPA regulations, as 'the current ability to operate or perform an action, when placing a call, without first being modified or technologically altered;' and (2) modify the definition of ATDS in 47 CFR 64.1200(f)(2) by adding the phrase 'without human intervention' to the end of the definition."  Gindi Decl., Ex. H. On November 19, 2013, the FCC issued a public notice seeking comment on the PACE petition. *See* Gindi Decl., Ex. I.  The FCC's deadline for reply comments closed on January 4, 2014. Lastly, in the *Petition for Expedited Declaratory Ruling and Clarification of TextMe, Inc.*, CG Docket No. 02-278 (filed Mar. 18, 2014), TextMe, Inc. asks the FCC to "clarify that the term 'capacity' as used in the statutory definition of an ATDS under § 227(a)(I) of the TCPA encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered."

A petition cited by Nationstar in its motion, *In the Matter of Communication Innovators' Petition for Declaratory Ruling*, GC Docket No. 02-278 (filed Jun. 7, 2012), was withdrawn on July 14, 2014.  *See* Dkt. No. 40, Ex. 1.  The withdrawal notice states, "Numerous other parties have sought clarification of issues involving the application of the TCPA to predictive dialers and other innovative technologies, as well as the definition of 'automatic telephone dialing system.' Because the legal issues raised by the CI petition would be encompassed by Commission action on those petitions (which have a more recent record), including on the clarification requested in the Petition for Rulemaking of ACA International, CI hereby respectfully withdraws its petition."  *Id*. The FCC had accepted comments on the petition through November 30, 2012.  Gindi Decl., Ex. C.

1    There is some indication that the FCC is considering the capacity issue.  In September

2    2013, the FCC released an exchange of correspondence between members of Congress and the

3    FCC where the FCC stated that "[a] draft order to resolve the Communication Innovators' Petition

4    is under consideration by the Commission, and Communication Innovators has met with the staff

5    recently to discuss the matter."  Gindi Decl., Ex. D.  The FCC stated, "We take seriously the

6    issues raised in the Petition and the potential impact on consumers, and expect the Commission to

7    resolve it soon."  *Id*.  On March 25, 2014, FCC Commissioner Michael O'Reilly posted a

8    publication on the FCC website titled, "TCPA: It's Time to Provide Clarity."  Gindi Decl., Ex. K.

9    In the publication, O'Reilly expresses concern over "a growing backlog of petitions pending at the

10   FCC," and notes that "the FCC needs to address this inventory of petitions as soon as possible."

11   *Id*.

12            **2.  Court Decisions on "Capacity"**

13            In *Satterfield v. Simon & Schuster, Inc.*, the Ninth Circuit held that "[w]hen evaluating the

14   issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must

15   be on whether the equipment has the *capacity* 'to store or produce telephone numbers to be called,

16   using a random or sequential number generator.'  Accordingly, a system need not actually store,

17   produce, or call randomly or sequentially generated telephone numbers, it need only have the

18   capacity to do it."  569 F.3d at 951 (quoting 47 U.S.C. § 227(a)(1)) (emphasis in original).  The

19   court emphasized that the text of section 227(a)(1) "is clear and unambiguous."  *Id*.

20            The Ninth Circuit reiterated this holding in *Meyer v. Portfolio Recovery Associates, LLC*,

21   707 F.3d 1036, 1043 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 2361 (2013).  The defendant, PRA,

22   argued that "its dialers do not have the present capacity to store or produce numbers using a

23   random or sequential number generator."  *Id*.  The Ninth Circuit disagreed:

24            As we explained in *Satterfield v. Simon & Schuster, Inc.*, the clear language of the
         TCPA 'mandates that the focus must be on whether the equipment has the capacity
25       "to store or produce telephone numbers to be called, using a random or sequential
         number generator."' 569 F.3d 946, 951 (9th Cir. 2009).  PRA's securities filing
26       shows that PRA uses predictive dialers.  PRA does not dispute that its predictive
         dialers have the capacity described in the TCPA. This is sufficient to determine that
27       PRA used an automatic telephone dialing system.  *See id*. ('[A] system need not
         actually store, produce, or call randomly or sequentially generated telephone
28

United States District Court
Northern District of California

10

numbers, it need only have the capacity to do it.').

*Id*.  The court further stated: "As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective.  The basic function of such equipment, however, has not changed – the capacity to dial numbers without human intervention."  *Id*. (citing *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14091–93 (July 3, 2003)).  The court concluded that the PRA's equipment fell "squarely" within this description.  *Id*.

In another case in this circuit, *Hickey v. Voxernet LLC*, the court denied a motion to dismiss, finding that the plaintiff had pled sufficient facts to plausibly allege that the defendant's technology qualified as an ATDS.  887 F. Supp. 2d 1125, 1129-30 (W.D. Wash. 2012).   The court stated:

> Plaintiff's allegation regarding the generic content and automatic generation of the message is sufficient to infer the use of an ATDS.  Although the precise relationship between software and hardware is unclear at this stage of litigation, the Court recognizes the difficulty of alleging details about an ATDS before discovery. Plaintiff has, however, provided sufficient detail to make a plausible claim under the TCPA and to allow for discovery of further evidence related to Voxer's ATDS functionality.

*Id.* at 1130; *see also, Knutson v. Reply!, Inc.*, No. 10-cv-01267, 2011 WL 1447756, at *1 (S.D. Cal. Apr. 13, 2011) (noting "the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery" and finding that courts can rely on details about the call to infer the use of an ATDS); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1260 (S.D. Cal. 2012) (denying motion to dismiss because plaintiffs "stated that they received a text message from an SMS short code and that the message was sent by a machine with the capacity to store or produce random telephone numbers," which was sufficient to plausibly allege that defendant used an ATDS); *Sherman v. Yahoo! Inc.*, No. 13-cv-00041, 2014 WL 369384, at *6-7 (S.D. Cal. Feb. 3, 2014) (denying motion for summary judgment where material issues of fact existed whether defendant's technology "has the requisite capacity to ***both*** store numbers and dial random or sequential numbers") (emphasis in original).

Recently, in *Pimental v. Google, Inc.*, Judge Gonzalez-Rogers denied a motion for stay in a case involving the interpretation of the terms "prior express consent" and "capacity."  No. 11-cv-

02585-YGR, 2012 WL 1458179, at *3 (N.D. Cal. Apr. 26, 2012). Judge Gonzalez-Rogers found that "[i]nterpretation of these statutory terms [does] not require the FCC's policy expertise or specialized knowledge and are matters safely within the conventional experience of judges. Indeed, courts and the FCC have interpreted these statutory terms in the past." *Id.* (citing *Satterfield*, 569 F.3d at 951). Judge Gonzalez-Rogers further stated that the "focus must be on the equipment's capacity to store, produce, or call randomly or sequentially generated telephone numbers, not whether the equipment actually did these things." *Id.* The court's decision to deny a stay was supported by the fact that, at that time, there was no indication that the FCC would take up the contested issues. *Id.* at *3-4 ("Although Defendants contend that the issues are now directly in front of the FCC, the Court is not convinced that the FCC has agreed to issue a ruling, let alone issue a ruling on an expedited basis.").

In contrast, Judge Hamilton granted a stay until the FCC issues a determination on the capacity issue. *Mendoza v. UnitedHealth Grp. Inc.*, No. 13-cv-01553-PJH, 2014 WL 722031, at *2 (N.D. Cal. Jan. 6, 2014). The defendant in that case asserted

> that at the time of the alleged calls, it did not utilize any capacity that its predictive dialer may have had to store or produce telephone numbers to be called using a random or sequential generator, and to dial such numbers. [The defendant] asserts further that there has been considerable debate regarding what constitutes an ATDS, and of relevance to this action, whether the dialing equipment's present capacity is the determinative factor in classifying it as an ATDS, or whether the equipment's potential capacity with hardware and/or software alterations should be considered, regardless of whether the potential capacity is utilized at the time the calls are made.

*Id.* Judge Hamilton, noting the pending YouMail and PACE petitions, found that "[t]he FCC is currently considering multiple petitions for a declaratory ruling that addresses this issue," which she found "directly overlaps with the legal issues before the court." *Id.* (citation omitted); *see also, Higginbotham v. Diversified Consultants, Inc.*, No. 13-cv-02624, 2014 WL 1930885 (D. Kan. May 14, 2014) (granting stay pending FCC's determination of issues raised by the Communications Innovators and YouMail petitions; finding that "the statutory reference to 'capacity' is unclear. The seminal question of its reach is a technical one, which falls in the ambit of the FCC's administrative expertise. How the FCC ultimately defines 'capacity' is a matter of

United States District Court
Northern District of California

administrative discretion"); *Passero v. Diversified Consultants, Inc.*, 13-cv-0338C, 2014 WL 2257185, at *3 (W.D. N.Y. May 28, 2014) (same; finding "that the advantages of deferring to the FCC's 'primary jurisdiction' over the issues raised by the TCPA claims in this case . . . outweigh the potential for costs resulting from further complications and delay in the administrative proceedings, considering the recent correspondence between the FCC and Congress indicating the likelihood of a ruling on the pending petitions relatively soon").[1]

### 3. Analysis

Considering Ninth Circuit case law on the meaning of "capacity," the content of the pending petitions, and the facts of this case, I find that application of the primary jurisdiction doctrine is not warranted here.  The interpretation of "capacity" is within the Ninth Circuit's experience, does not involve technical expertise, and does not impose a substantial danger of inconsistent rulings.  Moreover, it is not obvious that the petitions pending before the FCC, assuming even that the FCC eventually rules on them, will be determinative of the outcome of this case.

Nationstar asserts that the dialing system it used to call the plaintiffs does not qualify as an ATDS because it: (i) does not have the current capacity to store or produce telephone numbers to be called using a random or sequential number generator; and (ii) requires human intervention to initiate calls.  *See* Supp. Lemon Decl. ¶ 2.  The TCPA defines an ATDS as "equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." 47 U.S.C. § 227(a)(1).  The Ninth Circuit has held that "the statutory text is clear and unambiguous," *Satterfield*, 569 F.3d at 951, and courts in this Circuit have interpreted the term capacity consistently with the FCC's definition.  *See, e.g., id.; Meyer*, 707 F.3d at 1043; *Pimental*, 2012 WL 1458179 at *3.  Nationstar urges me to follow Judge Hamilton's decision in *Mendoza*, but that case did not cite the Ninth Circuit's decisions in *Satterfield* or *Meyers*.  *See* 2014 WL

---

[1] As noted above, in the joint statement submitted on October 15, 2014, Nationstar cites four other recent decisions granting stays of TCPA lawsuits in light of the petitions pending before the FCC. *See Pickens*, 2014 WL 4662512; *Wahl*, 2014 WL 4678043; *Lambert, Inc.*, 2014 WL 4187250; *Lee,* 2014 WL 4145504.  Three of the four decisions are out-of-circuit, and none provides new information regarding whether the FCC will in fact issue a relevant decision in the near future.

United States District Court
Northern District of California

722031, at *1-2.  Furthermore, Nationstar has not given any examples within the Ninth Circuit where courts have defined the term "capacity" inconsistently; Nationstar only contends that inconsistent rulings are a possibility.  Mot. at 10-11.

Additionally, the pending petitions may not be determinative on the issue of "capacity" in this case.  An FCC decision on whether an ATDS may include equipment with the "potential capacity" to store or produce numbers is irrelevant to the facts here because the declarations submitted with Nationstar's motion do not state that its equipment has the "potential capacity" to perform such functions.  *See* Lemon Decl., Supp. Lemon Decl.  Nationstar only asserts that its equipment lacks the current capacity to perform the functions of an ATDS as defined in the TCPA.  *Id.*  If Nationstar's assertions are true, then its equipment likely does not qualify as an ATDS, and a decision on the petitions currently pending before the FCC is not necessary to the outcome of this litigation.  Also, under Ninth Circuit precedent, the distinction between "current capacity" and "potential capacity" is a distinction without a difference.  As stated in *Pimental*, the "focus must be on the equipment's capacity to store, produce, or call randomly or sequentially generated telephone numbers, not whether the equipment *actually did these things*."  2012 WL 1458179, at *3 (citing *Satterfield*, 569 F.3d at 951) (emphasis added).

Likewise, the FCC and the Ninth Circuit have already stated that an ATDS operates without human intervention, and therefore any ruling by the FCC on that issue will not change the outcome of this case.  *See In re the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14017 (2003) (ATDS "covers any equipment that has the specified capacity to generate numbers and dial them *without human intervention*, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.") (emphasis added); *Meyer*, 707 F.3d at 1043 ("The basic function of such equipment, however, has not changed – the capacity to dial numbers without human intervention.").  The two petitions currently pending before the FCC ask that the words "without human intervention" be added to the definition of ATDS.  *See In re Professional Association for Customer Engagement's Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278 (filed October 18, 2013) (asking the FCC to "modify the definition of ATDS in 47 CFR 64.1200(f)(2) by adding the phrase 'without human

14

intervention' to the end of the definition."); *Petition for Expedited Declaratory Ruling and Clarification of TextMe, Inc.*, CG Docket No. 02-278 (filed Mar. 18, 2014) (asking the FCC to "clarify that the term 'capacity' as used in the statutory definition of an ATDS under § 227(a)(I) of the TCPA encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention"). These petitions merely ask the FCC to confirm a matter that has already been decided by both the FCC and the Ninth Circuit.

Lastly, the evidence that an FCC ruling on the capacity issue is "imminent" remains uncertain. The first piece of evidence is a September 10, 2013, letter from the FCC stating that the Communication Innovators petition, which was filed June 7, 2012, "is under consideration by the Commission" and the FCC expects to resolve the issues "soon." Gindi Decl., Ex. D. On July 14, 2014, however, the Communication Innovators petition was withdrawn. *See* Dkt. No. 40, Ex. 1.

The second piece of evidence is a March 25, 2014, statement by FCC Commissioner Michael O'Reilly expressing concern over "a growing backlog of petitions pending at the FCC," and noting, "the FCC needs to address this inventory of petitions as soon as possible." Gindi Decl., Ex. K. It states that through the pending petitions,

> the FCC has the opportunity to answer important questions . . . including what it means to initiate a call, whether there is liability for calls made to reassigned phone numbers, whether consent can be obtained through intermediaries, whether consent can be inferred through consumer behavior or social norms, whether devices including smartphones could be considered automatic telephone dialing systems, or what type of faxes are actually unsolicited.

*Id.* Some of the issues Nationstar raises are listed here. But the letter demonstrates that they are only a subset of the large number of TCPA-related issues currently under consideration by the FCC. There is no guarantee that the FCC will rule on these issues imminently, let alone that a ruling will determine the outcome of this case. *Compare Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (finding primary jurisdiction applied where claim raised issue of first impression, and "the FCC's Notice of Proposed Rulemaking demonstrates that the agency is actively considering" the particular issue).

A third piece of evidence is Chairman Wheeler's August 28, 2014 statement to Congress that the FCC plans to resolve "more than one-third" of the pending petitions regarding the TCPA

"within the next several months."  Dkt. No. 50 at 2.  But, again, there is no guarantee that the FCC

will be able to follow through on this plan, or that the petitions relevant to this case are among

those the agency plans to resolve.  Under these circumstances, a stay is not warranted.

**B.  Definition of "Called Party"**

Nationstar argues that this case should be stayed because the FCC has primary jurisdiction

to determine whether a caller is liable under the TCPA for calling an "unintended recipient."  Mot.

15.  The TCPA states:

> It shall be unlawful for any person within the United States, or any person outside
> the United States if the recipient is within the United States (A) to make any call
> (other than a call made for emergency purposes or made with the prior express
> consent of the called party) using any automatic telephone dialing system or an
> artificial or prerecorded voice . . . (iii) to any telephone number assigned to a paging
> service, cellular telephone service, specialized mobile radio service, or other radio
> common carrier service, or any service for which the called party is charged for the
> call.

47 U.S.C. § 227(b)(1).  Nationstar asserts that it "intended to call its customers, but

unintentionally called Jordan and Ruggles."  Mot. 16.  Nationstar asserts that these facts require a

stay until the FCC issues a ruling on the January 16, 2014, petition of United Healthcare Services,

Inc. seeking an expedited declaratory ruling clarifying that TCPA liability does not apply to "calls

to wireless numbers for which valid prior express consent has been obtained but which,

unbeknownst to the calling party, have subsequently been reassigned from one wireless subscriber

to another."  Gindi Decl., Ex. J (*Petition for Expedited Declaratory Ruling of United Healthcare

Services, Inc.*, CG Docket No. 02-278 (filed Jan. 16, 2014)).  On February 6, 2014, the FCC issued

a public notice seeking comment on United Healthcare's petition.

A stay pending an FCC ruling on this issue is not warranted under the primary jurisdiction

doctrine.  The Ninth Circuit has held that "prior express consent is consent to call a particular

telephone number in connection with a particular debt that is given before the call in question is

placed."  *Meyer*, 707 F.3d at 1042.  The Ninth Circuit has not directly addressed what the specific

definition of "called party" is under section 227(b)(1)(A), but district courts in this circuit have

generally rejected the "intended recipient" definition.  *See Olney v. Progressive Cas. Ins. Co.*, No.

13-cv-02058, 2014 WL 294498, at \*3 (S.D. Cal. Jan. 24, 2014); *Gutierrez v. Barclays Group*, No.

10-cv-01012, 2011 WL 579238, at *5 (S.D. Cal. Feb. 9, 2011).   The Seventh and Eleventh

Circuits have also ruled that "called party" means current subscriber under section 227(b)(1)(A).

*Soppet v. Enhanced Recovery Company., LLC*, 679 F.3d 637, 643 (7th Cir. 2012); *Osorio v. State

Farm Bank, F.S.B.*, No. 13-cv-10951, 2014 WL 1258023, at *7 (11th Cir. 2014).

The reasoning in *Soppet* is particularly helpful.  There, the Seventh Circuit held that the

TCPA requires consent from the person who was actually called, not the person the caller asserts it

was attempting to call.  In considering the phrase "called party," the court noted that while the

"called party" who must give consent is not defined, section 227(b)(1)(A)(iii) states that a caller is

liable for a TCPA violation when a call goes to a "cellular telephone service . . . for which the

called party is charged for the call."  *Id*.  From this, the court concluded that the "called party" in

this context is the person who is "charged for the call," *i.e.* the party who is financially responsible

for the account connected with the cellular telephone number that is called.  *Id*. at 640.  In support

of this conclusion, the court noted that for the seven uses of the phrase "called party" in section

227, "[f]our unmistakably denote the current subscriber (the person who pays the bills or needs the

line in order to receive other calls); one denotes whoever answers the call (usually the subscriber);

and the others (the two that deal with consent) have a referent that cannot be pinned down by

context."  *Id*.  None of the uses refer to the "intended recipient of the call," which is how the

defendant in *Soppet* defined the term, and the court declined to read such a concept into the

statute.  *Id.* ("The phrase 'intended recipient' does not appear anywhere in § 227, so what

justification could there be for equating 'called party' with 'intended recipient of the call'?").  That

"called party" has been interpreted consistently by multiple courts suggests that interpretation of

the phrase is does not require special expertise.

Nationstar asserts that two judges in this district have granted stays in light of  FCC

petitions regarding the "called party" issue.  In May 2014, Judge Henderson granted a motion to

stay "because the very issue on which plaintiff's claims are predicated – liability under the TCPA

when a wireless telephone user has changed phone numbers – is currently before the FCC."

*Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343-TEH, 2014 WL 1942829, at *2 (N.D. Cal.

May 12, 2014).  Judge Henderson determined that a stay was warranted because the FCC was

United States District Court
Northern District of California

17

seeking public comment on a petition seeking a declaratory ruling on whether "TCPA liability does not apply to informational, non-telemarketing autodialed and prerecorded calls to wireless numbers for which valid prior express consent has been obtained but which, unbeknownst to the calling party, have subsequently been reassigned from one wireless subscriber to another." *Id*. at *2. Judge Henderson rejected the plaintiffs' argument that the FCC may take a long time to rule on the pending petition, stating: "The Court does not find that potential delay in awaiting a definitive ruling from the FCC on this highly relevant issue outweighs issuance of the stay." *Id*. at *4.

*Barrera* is distinguishable from the present case because there, the subscriber who provided the telephone number "reasonably evidenced prior express consent" to be contacted at that number. *Id*. at *1. In this case, Nationstar does not show a single instance where express consent was given before the call was placed. There is also no evidence that Jordan and Ruggles' telephone numbers were transferred to them from a party who previously gave consent. Nationstar only states that it "intended to call its customers, but unintentionally called Jordan and Ruggles." Mot. 16. This is not the same issue before the FCC in the petition of United Healthcare Services, Inc., which seeks a ruling on whether TCPA liability applies to "calls to wireless numbers for which valid prior express consent has been obtained but which . . . have subsequently been reassigned from one wireless subscriber to another." Gindi Decl., Ex. J. Unlike in *Barrera*, the pending petition will not be determinative on the meaning of "called party" in this case.

The second Northern District judge highlighted by Nationstar is Judge Alsup, who ordered a six-month stay pending resolution of two FCC petitions regarding the definition of "called party" under section 227(b)(1)(A). *Heinrichs*, 2014 WL 2142457, at *2. The parties in that case disputed whether "called party" means "current subscriber" of the cell phone number or the defendant's "intended recipient." *Id*. at *1. Judge Alsup granted a six-month stay, noting that, "[w]ith the deadline for public comment having passed for both petitions, the next step by the FCC is to decide whether to propose a rule change to deal with the issue . . . In light of the distinct possibility that the FCC will clarify (or not) whether the theory of the pending civil action is viable . . . the FCC's guidance will be determinative of the underlying basis for relief." *Id*. at *2.

Of course, Judge Alsup has since lifted the stay in *Heinrichs*. That case no longer supports Nationstar's request for a stay, and I agree with Judge Alsup. In light of the FCC's response to Judge Alsup's request for a status update, it appears that awaiting the possibility of an FCC ruling clarifying the "called party" issue would only unnecessarily delay the resolution of this litigation.

## C.  Whether the TCPA Applies to Debt Collection Calls

Nationstar argues that the TCPA does not apply to the telephone calls it makes because it is a debt collector and the TCPA does not apply to "debt collection calls." Mot. 17. The FCC has determined that "debt collectors can be responsible for any violation of the TCPA." *Blair v. CBE Grp. Inc.*, 13-cv-00134, 2013 WL 2029155, at *3 (S.D. Cal. May 13, 2013) (citing *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd 559, 562 (F.C.C. 2007)). Courts in this circuit have also consistently held that debt collection calls are subject to TCPA liability. *See, e.g., Meyer*, 707 F.3d at 1045 (affirming preliminary injunction against defendant debt collector); *Iniguez v. The CBE Grp.*, 969 F. Supp. 2d 1241, 1247 (E.D. Cal. 2013) ("There is no exception for debt collectors in the statute . . . [T]he federal regulations applicable to the TCPA do not contain a debt collector exception . . . The TCPA therefore applies to debt collectors and they may be liable for offending calls."); *Robinson v. Midland Funding, LLC*, 2011 U.S. Dist. LEXIS 40107, at *13 (S.D. Cal. Apr. 13, 2011) ("The FCC has already issued a declaratory ruling stating debt collectors who make autodialed or prerecorded calls to a wireless number are responsible for any violation of the TCPA."); *see also, Mims v. Arrow Fin. Servs.*, 132 S. Ct. 740, 746 (2012) (holding that federal district courts have jurisdiction over private TCPA actions in a case involving a debt collection agency).

Nationstar's specific activities may be exempt from the TCPA based on two exceptions. First, prerecorded calls made to any person with whom the caller has an "established business relationship" at the time the call is made, and calls made for a "commercial purpose" other than unsolicited advertisements and telephone solicitations, are not prohibited by the TCPA. 47 C.F.R. 64.1200(a)(2)(iii-iv); *see also, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8773. The cases that Nationstar cites hold

United States District Court
Northern District of California

1    that a stay is warranted while the FCC addresses petitions seeking to clarify these two exceptions.

2    *See Hurrle v. Real Time Resolutions, Inc.*, No. 13-cv-05765, 2014 WL 670639, at *1 (W.D. Wash.

3    Feb. 20, 2014); *Passero*, 2014 WL 2257185, at *2.

4         But the issue Nationstar presents here is whether the TCPA categorically "applies to debt

5    collection calls." Mot. 17-18. The law is well-settled that TCPA liability may apply to debt

6    collection calls. A stay is not warranted on this ground.

7    **D.  Other Considerations Also Weigh Against a Stay**

8         A court must balance the parties' need to resolve the action expeditiously against the

9    benefits of obtaining the federal agency's expertise on the issues. *Maronyan*, 658 F.3d at 1049. In

10   this case, awaiting a ruling by the FCC would likely involve substantial delay, and as discussed

11   above, a ruling on the pending petitions would not be dispositive on the outcome of the litigation.

12   The impact of such delay on the expedient resolution of disputes and the interest of providing

13   certainty to the parties here and to others similarly situated outweigh any potential benefits of

14   deferring to the FCC. Nationstar will not be prejudiced if the case moves forward, because any

15   FCC ruling that might excuse Nationstar of liability may be addressed through a renewed motion

16   to stay under the primary jurisdiction doctrine or a motion for summary judgment.[2] Given Rule

17   1's mandate "to secure the just, speedy, and inexpensive determination of every action and

18   proceeding," this case should go forward. *See* Fed. R. Civ. P. 1.

19

20

21

22

23

24

25

26   _____

27   [2] While agency rules are generally not to be applied retroactively, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), regulations promulgated by the FCC that merely interpret provisions of an act do not present retroactivity concerns. *AT&T Commc'ns Sys. v. Pac. Bell*, 203

28   F.3d 1183, 1187 (9th Cir. 2000). Because the pending petitions cited by Nationstar seek interpretive rulings, any ruling on the petitions would apply to Nationstar retroactively.

United States District Court
Northern District of California

**CONCLUSION**

For the reasons above, the stay imposed by my September 4, 2014 order is LIFTED and Nationstar's motion for stay is DENIED.

A further case management conference is scheduled for **November 18, 2014** at 2:00 p.m. in Courtroom 2. The parties are ordered to meet and confer on or before October 31, 2014 concerning a proposed case schedule. If the parties agree on a schedule, they should submit a stipulation and proposed order; in that event, the parties may also stipulate that an immediate case management conference is unnecessary. Otherwise, the parties shall submit a further joint case management statement on or before November 10, 2014 with their competing proposals for the case schedule and any other issue needing my attention.

**IT IS SO ORDERED**.

Dated: October 20, 2014



WILLIAM H. ORRICK
United States District Judge